FILED

2019 APR 18 AM 11:27

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 19CR00232-FMO |
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 1347: Health Care Fraud; 26 U.S.C. § 7206(1): Subscribing to a False Federal Income Tax Return] |
| CLIFFORD GLASSMAN, | |
| Defendant. | |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. § 1347]

I. GENERAL ALLEGATIONS

At all times relevant to this Information:

A. Individuals and Entities

1. Defendant CLIFFORD GLASSMAN ("defendant GLASSMAN") resided in the City of Glendora, in Los Angeles County, California. Defendant GLASSMAN owned and operated a medical marketing business called California Clinical Trials LLC ("CCT") whose business address was located in Glendora, California. CCT purported to conduct clinical trials for prescription medications as described below.

MA:ma

2. Pharmacy 1 was a pharmacy owned and controlled by Pharmacy Owner 1 and Pharmacy Owner 2, with its principal place of business in Studio City, California. Pharmacy 1 was not in any way associated with the University of California, any of its campuses, or its student health care insurance program described below.

3. Pharmacy 2 was a pharmacy owned and controlled by Pharmacy Owner 1 and Pharmacy Owner 2, with its principal place of business in Chino, California. Pharmacy 2 was not in any way associated with the University of California, any of its campuses, or its student health care insurance program described below.

4. Pharmacy 1 and Pharmacy 2 filled prescriptions for medications as described below. In turn, Pharmacy Owner 1 and Pharmacy Owner 2, and others known and unknown to the United States Attorney, generated income for Pharmacy 1 and Pharmacy 2 by causing claims to be submitted to insurers and other entities, including to OptumRX on behalf of the University of California's Student Health Insurance Plan ("UCSHIP"), for reimbursement for filling such prescriptions.

5. Pharmacy Owner 1 and Pharmacy Owner 2, and others known and unknown to the United States Attorney, paid and caused to be paid to defendant GLASSMAN and others substantial fees for steering prescriptions for medications to Pharmacy 1 and Pharmacy 2 for fulfillment.

6. Pharmacist 1 was licensed to practice pharmacy in the State of California, and the pharmacist-in-charge of both Pharmacy 1 and Pharmacy 2.

7. Podiatrist 1 was licensed to practice podiatric medicine in the State of California, with an office located in Hacienda Heights, California.

8. Physician 1 and Physician 2 were osteopathic physicians, licensed to practice medicine in the State of California, with their offices located in Diamond Bar and Newport Beach, California, respectively.

9. The Food and Drug Administration ("FDA") was a U.S. agency with primary responsibility to protect public health by ensuring that human drugs, vaccines, and other biological products intended for human use were safe and effective.

B. UCSHIP

10. The University of California ("UC") was a public university with 10 campuses around the State of California, including in Los Angeles, Irvine, Riverside, and San Diego. The UC offered health insurance, including a prescription drug benefit, to its students through UCSHIP. UCSHIP was a health insurance benefit plan administered by the UC and funded entirely through premiums paid by UC students. OptumRX was a pharmacy benefit manager ("PBM") that managed the claims process for UCSHIP to enable health care providers to bill UCSHIP for rendering covered services, including filling prescriptions for medications, and receive reimbursements for such services and prescriptions.

11. UCSHIP was a "health care benefit program," as defined under 18 U.S.C. § 24, namely, a public or private plan or contract, affecting commerce, under which medical benefits, items, or services were provided to individuals.

### C. Compounded Medications

12. In general, "compounding" was a practice by which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combined, mixed, or altered ingredients of a drug or multiple drugs to create a drug or medication tailored to the needs of an individual patient. Compounded medications were not FDA-approved, that is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded medications. The California State Board of Pharmacy regulated the practice of compounding in the State of California.

13. Compounded medications could be prescribed by a physician when an FDA-approved drug did not meet the health needs of a particular patient. For example, if a patient were allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative, a compounded medication could be prepared excluding the substance that triggered the allergic reaction. Compounded medications could also be prescribed when a patient could not consume a medication by traditional means, such as an elderly patient or a child who could not swallow an FDA-approved pill and needed the medication in a liquid form that was not otherwise available.

### D. The Subject Medications

14. DermacinRx Lexitral PharmaPak ("Dermacin"), manufactured by PureTek Corporation, was a prescription medication package consisting of a topical solution containing diclofenac sodium, a nonsteroidal anti-inflammatory medication,

and "Penetral," the brand-name for a compounded topical cream containing capsaicin as its active ingredient. Capsaicin was an extract of cayenne pepper and acted to control peripheral nerve pain.

15. Inflammacin was a prescription medication package, also manufactured by PureTek Corporation, consisting of diclofenac sodium tablets for oral ingestion and "Penetral" cream.

16. Diclofex DC ("Diclofex") was a prescription medication package, manufactured by Sircle Laboratories, consisting of a topical solution containing diclofenac sodium and a compounded cream with capsaicin as its active ingredient.

17. Dermacin, Inflammacin, and Diclofex, at times collectively referred to herein as the "Subject Medications," provided essentially the same medical benefit as over-the-counter, non-prescription medications such as Aleve and Ben-Gay. While a typical, store-bought container of 200-count Aleve pills might cost approximately $10, a typical, store-bought 2 oz. tube of Ben-Gay might cost approximately $5, and a typical, over-the-counter, 1.5 oz. tube of capsaicin cream might cost approximately $10, the per-prescription cost of Dermacin and Inflammacin, was approximately $4,600 and $3,000, respectively, and the per-prescription cost of Diclofex was approximately $5,100.

18. The FDA had approved Dermacin, Inflammacin, and Diclofex for treatment of osteoarthritis, a condition that, in general, afflicted older adults and was uncommon among the far-younger population of college-age students.

19. From on or about September 1, 2016, to on or about April 13, 2017, Pharmacy 1 and Pharmacy 2 filled prescriptions for, and submitted reimbursement claims to be paid by UCSHIP with respect to, the following medications prescribed by the following health care providers (all amounts approximate):

| Drug(s) | Podiatrist 1 | Physician 1 | Physician 2 | Total Prescriptions | Total Paid by UCSHIP |
|---|---|---|---|---|---|
| Dermacin prescriptions written | 664 | 158 | 2 | 824 | ▮ |
| Reimbursements for Dermacin Prescriptions | $3,065,466 | $726,830 | $9,245 | ▮ | $3,801,541 |
| Inflammacin prescriptions written | 799 | 10 | 5 | 814 | ▮ |
| Reimbursements for Inflammacin Prescriptions | $2,394,522 | $29,976 | $14,983 | ▮ | $2,439,481 |
| Diclofex Prescriptions Written | 135 | 16 | | 151 | ▮ |
| Reimbursements for Diclofex Prescriptions | $717,001 | $84,973 | | ▮ | $801,974 |
| Total Prescriptions | 1,598 | 184 | 7 | 1,973 | ▮ |
| Total Reimbursements | $6,176,989 | $841,779 | $24,228 | ▮ | $7,042,996 |

E. **Clinical Trials**

20. As defined by the National Institutes of Health ("NIH") and the World Health Organization, a clinical trial was a research study that prospectively assigns human participants or groups of humans to one or more health-related interventions (which may include placebos or other controls, including, but not restricted to, drugs, cells, and other biological products, surgical procedures, radiological procedures, devices, behavioral treatments, process-of-care changes, or preventative care), to evaluate the effects of those interventions on health-related biomedical or behavioral outcomes.

21. Although not applicable to all clinical trials, NIH published clinical trial protocols and procedures that were designed to uniformly regulate clinical trials to ensure that such trials were conducted without bias and with the highest scientific and ethical standards, including ensuring against financial conflicts of interest. Such trials were subject to rigorous compliance and oversight, including, but not limited to, the designation and vetting of a principal investigator, oftentimes a medical doctor, review of trial results by an institutional review board ("IRB"), and peer reviewed findings.

22. The FDA required that each study of a drug, biological product, or medical device that the FDA regulated be reviewed, approved, and monitored by an IRB. Such IRBs were typically made up of doctors, researchers, and members of the related community whose role was to ensure that the clinical trial was ethical and that the rights and welfare of the participants were protected, including minimizing research risks and ensuring informed consent.

II. THE FRAUDULENT SCHEME

23. Beginning on a date unknown, but as least as early as in or about August 2016, and continuing to in or about April 2017, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, defendant GLASSMAN, together with others known and unknown to the United States Attorney, knowingly, willfully, and with the intent to defraud, executed and attempted to execute a scheme and artifice: (1) to defraud UCSHIP as to material matters in connection with the delivery of and payment for health care

benefits, items, and services; and (2) to obtain money and property from UCSHIP by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts, in connection with the delivery of and payment for health care benefits, items, and services.

24. The fraudulent scheme operated, in substance, in the following manner:

    a. Defendant GLASSMAN, Pharmacy Owner 1, Pharmacy Owner 2, and others known and unknown to the United States Attorney, would enter into an agreement whereby Pharmacy Owner 1 and Pharmacy Owner 2 would pay and cause to be paid to defendant GLASSMAN a substantial fee for referring Subject Medications prescriptions to Pharmacy 1 and Pharmacy 2 as part of a purported clinical trial. In turn, Pharmacy Owner 1 and Pharmacy Owner 2 caused Pharmacy 1 and Pharmacy 2 to fill such prescriptions and submit claims to UCSHIP for reimbursement out of which Pharmacy Owner 1 and Pharmacy Owner 2 would cause such referral fees to be paid to defendant GLASSMAN.

    b. Defendant GLASSMAN formed CCT to create an apparently legitimate entity that would solicit UCSHIP student beneficiaries to participate in a purported clinical trial and to conceal his role and the roles of Pharmacy Owner 1 and Pharmacy Owner 2 in soliciting participants in the purported clinical trial.

    c. Defendant GLASSMAN also caused others to solicit, via social media, including Facebook, UCSHIP student beneficiaries to participate in the purported clinical trial. As part of the solicitation, defendant GLASSMAN, and others

known and unknown to the United States Attorney, offered to pay, and did pay, such student beneficiaries a "participation" or similar fee of approximately $400.

   d. Defendant GLASSMAN, and others known and unknown to the United States Attorney, prepared a "questionnaire" that was designed to fool UCSHIP student beneficiaries into believing that they were participating in a real clinical trial and into providing personal identifying information and other sensitive personal health information that defendant GLASSMAN, and others known and unknown to the United States Attorney, needed in order to submit claims for reimbursement to UCSHIP.

   e. Defendant GLASSMAN arranged for Podiatrist 1, Physician 1, and Physician 2 to examine UCSHIP student beneficiaries, oftentimes in groups of up to approximately five individuals, and to, in turn, prescribe one or more Subject Medications prescriptions for each UCSHIP student beneficiary on a "check-the-box" form prepared by defendant GLASSMAN and others known and unknown to the United States Attorney.

   f. Pharmacy Owner 1, Pharmacy Owner 2, Pharmacist 1, and others known and unknown to the United States Attorney, ordered the Subject Medications, filled and cause to be filled those Subject Medications prescriptions submitted by defendant GLASSMAN to Pharmacy 1 and Pharmacy 2, and submitted claims to UCSHIP, including, as necessary, through its PBM, OptumRX, for reimbursement. Pharmacy Owner 1, Pharmacy Owner 2, Pharmacist 1, and others known and unknown to the United States Attorney, knew that the Subject Medications prescriptions were suspicious, and likely fraudulent, because, among other things:

(1) None of the Subject Medications prescriptions arose from an established, genuine physician-patient relationship between each UCSHIP student beneficiary and the prescribing health provider because, among other things, each such UCSHIP student beneficiary had readily-available health care on campus, especially for the purported health care conditions for which the Subject Medications were purportedly indicated;

(2) Substantially all of the Subject Medications prescriptions were caused to be submitted by defendant GLASSMAN pursuant to his referral fee arrangement as described above;

(3) Substantially all of the Subject Medications prescriptions used an identical or nearly identical form with pre-formulated and "check-the-box" areas on the form, and the prescriptions were received in large quantities at the same time from the same prescriber;

(4) Few, if any, of the UCSHIP student beneficiaries for whom Subject Medications prescriptions were filled by Pharmacy 1 or Pharmacy 2 ever paid, nor did Pharmacy 1 or Pharmacy 2 attempt or intend to collect, any copayment, even though Pharmacy 1 and Pharmacy 2 knew, or could easily have determined, that each was required to collect a copayment for each Subject Medication prescription;

(5) Neither Pharmacy 1 nor Pharmacy 2 had any direct contact with the UCSHIP student beneficiaries. Instead, Pharmacy Owner 1, Pharmacy Owner 2, and others known and unknown to the United States Attorney caused Pharmacy 1 and Pharmacy 2

to mail substantially all of the filled Subject Medications prescriptions to the UCSHIP student beneficiaries for whom the Subject Medications had been prescribed;

   (6) For each of the Subject Medications, a comparable, far cheaper over-the-counter, non-prescription medication was readily available, including on campus;

   (7) Neither Pharmacy 1 nor Pharmacy 2 had filled substantially similar prescriptions in any period of time preceding the referral fee agreement reached with defendant GLASSMAN as described above; and

   (8) On or about April 18, 2017, after learning that Pharmacy 1 had been blocked from submitting claims for reimbursement for filling prescriptions for the Subject Medications, Pharmacy Owner 1, Pharmacy Owner 2, Pharmacist 1, and others known and unknown to the United States Attorney, caused approximately 600 prescriptions for medications similar to the Subject Medications, written by Podiatrist 1, pertaining to approximately 219 UCSHIP student beneficiaries, to be submitted by and on behalf of Pharmacy 2 in order to create the appearance that such prescriptions had been originated on a date prior to the date on which Pharmacy 1 had been blocked from submitting such prescriptions.

III. EXECUTION OF THE FRAUDULENT SCHEME

  25. On or about February 7, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant GLASSMAN, together with others known and unknown to the United States Attorney, knowingly and willfully executed and attempted to execute the fraudulent scheme described above by

submitting and causing to be submitted to UCSHIP a false and fraudulent claim for reimbursement for medications on behalf of UCSHIP student beneficiary M.A., that were prescribed by Physician 2, and that were not medically necessary.

## COUNT TWO

[26 U.S.C. § 7206(1)]

26. On or about March 10, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant CLIFFORD GLASSMAN (defendant "GLASSMAN"), a resident of Glendora, California, willfully made and subscribed to a materially false United States corporate Internal Revenue Service return, Form 1120-S, including a Form 1125-A, for the calendar year 2015, in the name of Glassman & Associates, Inc., that was filed with the Internal Revenue Service and was verified by defendant GLASSMAN by a written declaration that it was made under the penalties of perjury, which defendant GLASSMAN did not believe to be true and correct as to every material matter, in that, on line 2 of such Form 1125-A, defendant GLASSMAN stated that "Glassman & Associates, Inc.," an entity then wholly owned by defendant GLASSMAN, had incurred approximately $300,800 in "purchases" that defendant GLASSMAN used to inflate the "cost of goods sold" on line 8 of such Form 1125-A in such amount, to a total amount of approximately $350,975, and the latter amount of which defendant GLASSMAN then repeated on line 2 of Form 1120-S when, as defendant GLASSMAN then and there well knew and believed, no such "purchases" had been incurred as part of the costs of goods sold and, in turn,

///
///
///
///
///

<pre>defendant GLASSMAN's individual total taxable income for that year was substantially higher than the amount he had reported.</pre>

NICOLA T. HANNA
United States Attorney

*/s/ Lawrence S. Middleton*

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

POONAM KUMAR
Assistant United States Attorney
Deputy Chief, Major Frauds Section

MARK AVEIS
Assistant United States Attorney

                              14